## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| XL SPECIALTY INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> BIGHORN CONSTRUCTION AND RECLAMATION, LLC, BRIDGELINK ENGINEERING, LLC, BRIDGELINK COMMODITIES, LLC, BRIDGELINK INVESTMENTS, LLC, BRIDGELINK DEVELOPMENT, LLC, BRIDGELINK RENEWABLE ENERGY INVESTMENTS LLC, INTERMOUNTAIN ELECTRIC SERVICE, INC.,  BIGHORN INVESTMENTS AND PROPERTIES, LLC, COLE W. JOHNSON, CORD H. JOHNSON, CASSIE J. HAMILTON <br><br> Defendants. | Civil Action No. 1:21-cv-03068 (GLR) |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENT MOTION FOR TEMPORARY AND PRELIMINARY INJUNCTIONS

Plaintiff, XL Specialty Insurance Company ("XL"), by and through counsel,

submits this memorandum of law in support of its Emergent Motion for Temporary

and Preliminary Injunctions.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

    A.  The Indemnity Agreement ................................................................. 4

    B.  The Bonds and XL's Exposure .......................................................... 7

      i.   The Depcom Project............................................................... 7

      ii.  The Monmouth Project ........................................................ 8

    C.  XL'S Demands Upon the Indemnitors.............................................. 9

THIS APPLICATION IS GOVERNED BY NEW YORK LAW
THROUGH AN ENFORCEABLE CHOICE OF LAW PROVISION .................... 10

STANDARD FOR TEMPORARY RESTRAINTS
AND PRELIMINARY INJUNCTION .................................................................... 11

LEGAL ARGUMENT........................................................................................... 13

POINT I
XL WILL SUFFER IRREPARABLE HARM WITHOUT THE
REQUESTED RELIEF .......................................................................................... 13

POINT II
XL WILL UNDOUBTEDLY PREVAIL ON THE MERITS .................................. 17

    A.  XL is Contractually Entitled to Receive Collateral Security ........................... 17

  B.  XL is Contractually Entitled to Access the Indemnitors' Books and
Records ........................................................................................... 20
  C.  XL is Entitled to *Quia Timet* Relief .................................................. 22

POINT III
THE INDEMNITORS WILL SUFFER NO HARM IF THE
REQUESTED RELIEF IS GRANTED ...................................................... 24

POINT IV
THE PUBLIC INTEREST WEIGHS IN FAVOR OF THE COURT
ORDERING THE REQUESTED RELIEF .................................................. 26

POINT V
THE DECISION OF THE SUPREME COURT OF THE UNITED
STATES IN *GRUPO MEXICANO V. ALLIANCE BOND FUND, INC.*
DOES NOT PRECLUDE THIS COURT FROM GRANTING XL'S
APPLICATION .................................................................................... 27

CONCLUSION ........................................................................................ 31

# <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Am. Motorists Ins. Co. v. Pennsylvania Beads Corp.,</u>
 983 F. Supp. 437 (S.D.N.Y. 1997) ................................................... 14, 24

<u>Am. Motorists Ins. Co. v. United Furnace Co.,</u>
 876 F.2d 293 (2d Cir. 1989) .......................................................... 13, 17

<u>American Telephone and Telegraph, Co.,</u>
 42 F.3d at 1421 (3d Cir 1994) ............................................................ 25

<u>Berkley Reg'l Ins. Co. v. Murray,</u>
 2016 U.S. Dist. LEXIS 6684 (D. Md. January 20, 2016) ................................ 10, 14

<u>BIB Constr. Co., Inc., v. Fireman's Ins. Co. of Newark NJ,</u>
 214 A.D.2d 521 (N.Y. App. Div. 1995) .................................................... 18

<u>City of New Orleans v. Christmas,</u>
 131 U.S. 191 (1889) ...................................................................... 22

<u>Coastal Labs., Inc. v. Jolly,</u>
 2021 U.S. Dist. LEXIS 78548 (D. Md. April 23, 2021) ...................................... 11

<u>Colonial Sur. Co. v. A&R Capital Assocs.,</u>
 420 F. Supp. 3d 38 (E.D.N.Y. 2017) ....................................................... 20

<u>Colonial Sur. Co., v. Genesee Valley Nurseries, Inc.,</u>
 5 A.D.3d 1024 (N.Y. App. Div. 2004) ...................................................... 18

<u>Colonial Surety Co. v. Eastland Const. Inc.,</u>
 2009 N.Y. Misc. LEXIS 4167 (N.Y. Sup. Ct. July 30, 2009) ................... 13, 18, 20

Deckert v. Independence Shares Corp.,
   311 U.S. 282 (1940) ................................................................ 28

Developers Sur. & Indem. Co. v. Bi-Tech Const., Inc.,
   964 F. Supp. 2d 1304 (S.D. Fla. 2013).................................... 15

Eakin r. Cont'l Illinois Nat'l Bank & Trust Co. of Chicago,
   121 F.R.D. 363 (N.D. III. 1988).............................................. 14

Employers Ins. of Wausau v. Bond,
   1991 U.S. Dist. LEXIS 951 (D. Md. 1991)............................. 17

Faltings v. IBM,
   1988 U.S. App. LEXIS 19562 (4th Cir. 1988)........................ 10

Federal Savings & Loan Ins. Corp. v. Dixon,
   835 F.2d 554 (5th Cir. 1987) .................................................. 27

First National Ins. Co. of Am. v. Sappah Brothers Inc,
   771 F. Supp. 2d 569 (E.D.N.C. 2011) .................................... 14

Francis v. Allstate Ins. Co.,
   709 F.3d 362, 369 (4th Cir. 2013) .......................................... 10

Grupo Mexicano v. Alliance Bond Fund, Inc.,
   527 U.S. 308 (1999) .......................................................... 26, 28

Gucci America, Inc. v. Weixing Li,
   2012 U.S. Dist. LEXIS 171520 (S.D.N.Y. Aug. 23, 2011). ... 28

Hanover Ins. Co. v. Engineered Sys. All., LLC,
   2019 U.S. Dist. LEXIS 32749 (D. Md. 2019)........................ 10

Hartford Casualty Ins. Co. v. Cal-Tran Assocs., Inc.,
   2008 U.S. Dist. LEXIS 71736 (D.N.J. Sept. 4, 2008).............................................. 20

Hartford Fire Ins. Co. v. Saunders Concrete Co. Inc,
   2012 U.S. Dist. LEXIS 125116 (N.D.N.Y. Sept. 4, 2012) ..................................... 13

In re Gas Reclamation, Inc. Sec. Litigation,
   741 F. Supp. 1094 (S.D.N.Y. 1990)........................................................................ 22

In re: Focus Media, Inc.,
   387 F. 3d 1077 (9th Cir. 2004) ................................................................................ 29

Int'l Fid. Ins. Co. v. Anchor Envt'l, Inc.,
   2008 U.S. Dist. LEXIS 35996 (E.D. Pa. May 1, 2008) ............................. 14, 24, 26

International Fidelity Ins. Co. v. Waterfront Group NC, LLC,
   2001 U.S. Dist. LEXIS 11631 (W.D.N.C. Oct. 6, 2011) ........................................ 14

Levi Strauss & Co. v. Sunrise Int'l. Trading, Inc.,
   51 F.3d 982 (11th Cir. 1995) ................................................................................... 27

Liberty Mut. Ins. Co. v. Aventura Eng'g & Const. Corp.,
   534 F. Supp. 2d 1290 (S.D. Fla. 2008).................................................................... 24

Marsellis-Warner Corp. v. Rabens,
51 F.Supp.2d at 508 (D.N.J. 1999).......................................................................... 25

Mayson-Dixon Strategic Consulting, LLC v. Mason-Dixon Polling &
   Strategic Consulting, Inc.,
   324 F. Supp. 3d 569 (D. Md. 2018) ........................................................................ 12

National Union Fire Ins. Co. v. Kozeny,
   115 F.Supp.2d 1243 (D.Colo. 2000) ....................................................................... 28

Newby v. Enron Corp.,
   188 F. Supp 2d 684 (S.D. Texas 2002) ................................................................. 27


Pashby v. Delia,
   709 F.3d 307 (4th Cir. 2013) .............................................................................. 12


Prestige Decorating & Wallcovering, Inc. v. US Fire Ins. Co.,
   2007 WL 5555819 (NY. Sup. Ct. May 10, 2007) ................................................. 18


Quantum Corp. Funding, Ltd. V. Assist You Health Care Serv. of
   Virginia,
   144 F. Supp.2d 241 (S.D.N.Y. 2001) .................................................................. 28


Rahman v. Oncology Assoc., P.C.,
   198 F.3d 489 (4th Cir. 1999) ........................................................................ 27, 29


Real Truth About Obama, Inc. v. Fed Election Comm'n,
   575 F.3d 342 (4th Cir. 2009) .............................................................................. 11


Republic of the Philippines v. Marcos,
   862 F.2d 1355 (9th Cir. 1988) ............................................................................ 27


RLI Ins. Co. v. Commercial  Money Center, Inc.,
   2002 U.S. Dist. LEXIS 29232 (S.D. Cal. Jun. 6, 2002) ........................................ 20


Safeco Ins. Co. of Am. v. Hirani/MES, JV,
   480 F. App'x 606 (2d Cir. 2012) ......................................................................... 13


Sanderson Farms, Inc. v. Tyson Foods, Inc.,
   547 F. Supp. 2d 491 (D. Md. April 22, 2008) ...................................................... 12


SEC v. Cavanagh,
   445 F. 3d 105 (2d. Cir. 2006) ............................................................................. 29

SEC v. ETC Payphones, Inc.,
  408 F. 3d 727 (11th Cir. 2005) .................................................................. 29

Senior Executives Ass'n v. U.S.,
  891 F. Supp. 2d 745 (D. Md. 2012) ......................................................... 11

Sumanth v. Essential Brands, Inc.,
  2018 U.S. Dist. LEXIS 11968 (D. Md. January 24, 2018) ..................................... 10

Sweet People Apparel, Inc. v. Fame of NY, Inc.,
  2011 U.S. Dist. LEXIS 78336 (D. N.J. July 19, 2011) .......................................... 28

Travelers Cas. & Sur. Co. of Am. v. C.R. Calderon Constr., Inc.,
  2017 U.S. Dist. LEXIS 77469 (D. Md. May 22, 2017) ............................. 13, 14, 15

Travelers Casualty & Surety Co. of Am. v. J.O.A. Constr. Co.,
  2009 U.S. Dist. LEXIS 30553 (E.D. Mich. Mar. 31, 2009).................................... 20

U.S. v. JMG Excavating & Constr. Co., Inc.,
  2004 U.S. Dist. LEXIS 13334 (D. Me. Jul. 16, 2004) ........................................... 20

United States Fidelity & Guaranty Co. v. J United Electrical
  Contracting Corp.,
  62 F. Supp. 2d 915 (E.D.N.Y. 1999)......................................................... 17

## PRELIMINARY STATEMENT

This is an action by XL to, among other things, immediately obtain specific performance of its contractual rights to receive adequate collateral security, specific performance of its contractual rights to access to books, records, accounts, and other information, as well as *quia timet* relief.

In consideration for and in order to induce XL to issue bonds, as surety, on behalf of Bighorn Construction and Reclamation, LLC ("BCR"), as principal, BRC, Bridgelink Engineering, LLC, Bridgelink Commodities, LLC, Bridgelink Investments, LLC, Bridgelink Development, LLC, Bridgelink Renewable Energy Investments, LLC, Intermountain Electric Service, Inc., Bighorn Investments and Properties, LLC, Cole W. Johnson, Cord H. Johnson, and Cassie J. Hamilton (collectively, the "Indemnitors") executed a General Agreement of Indemnity in favor of XL, as indemnitee (the "Indemnity Agreement"). Pursuant to the Indemnity Agreement, the Indemnitors agreed, among other things, to be held jointly and severally liable to deposit collateral security with XL immediately upon demand in connection with any claims asserted under any bond issued by XL on behalf of BCR. The Indemnitors also agreed to provide XL with unrestricted access to all books, records, accounts, and financial statements of each of the Indemnitors.

Following the execution of the Indemnity Agreement, XL, as surety, issued, among other things, performance bonds and payment bonds on behalf of BCR as

1

principal, in connection with: (i) a construction subcontract for the MD70 Richfield photovoltaic power plant project ("Depcom Project"); and (ii) a construction subcontract for the Monmouth Solar project ("Monmouth Project"). Thereafter: (i) Richfield Farms, LLC ("Richfield Farms")  and United Rentals made claims for payment under the payment bond issued by XL in connection with the Depcom Project; (ii) Depcom Power, Inc. ("Depcom") made a claim for payment under the performance bond issued by XL in connection with the Depcom Project after BRC allegedly failed to perform and/or make appropriate payments under the construction subcontract; and (iii) MYR Energy Services, Inc. ("MYR") declared BCR in default of its subcontract on the Monmouth Project and has threatened to terminate BCR and make a claim against the performance bond that XL issued in connection with the Monmouth Project.

XL submits this memorandum of law in support of its application for temporary restraints and a mandatory injunction, to require the Indemnitors to post collateral with XL in the amount of $2,000,000, or, if the Indemnitors fail to post such collateral, prohibit the Indemnitors from transferring any assets in order to secure XL's obligations under the performance bond and payment bond.  In its application, XL is also respectfully requesting that this Court require the Indemnitors to make their books, records, accounts, and financial statements immediately available in order to provide XL with an opportunity to review such books, records, accounts, and financial

statements prior to their destruction or corruption. Injunctive relief is required and appropriate to fully effectuate XL's contractual rights and its *quia timet* rights based upon equitable, common law, and contractual principles.

XL's entitlement to immediate relief is clear because anything less would release the Indemnitors of their contractual and common law obligations to deposit collateral security with XL and to make their books, records, accounts, and financial statements available for inspection. Further, without the requested relief, the Indemnitors would be free to dispose of assets that should be made available to XL for the fulfillment of the Indemnitor's obligations under the performance bonds and payment bonds and the Indemnity Agreement.

Accordingly, as the need for emergent relief to enforce XL's contractual rights and its, *quia timet* rights is clear, XL respectfully requests that the injunctive relief sought herein be granted.

## <u>STATEMENT OF FACTS</u>

The Verified Complaint sets forth, in detail, the facts giving rise to XL's claims, which include the Indemnitors' contractual obligations to deposit collateral, exoneration, indemnification, and XL's *quia timet* rights.

## A. The Indemnity Agreement

BCR was, at all relevant times, engaged in the construction contracting business. See Verified Complaint at ¶ 15. BCR was required to provide payment and performance bonds in connection with certain of its construction contracts. Id. at 16. In consideration for and in order to induce XL, as surety, to issue bonds on behalf of BCR, as principal, the Indemnitors executed the Indemnity Agreement in favor of XL, as indemnitee. Id. at 17.

Pursuant to Paragraph 3 of the Indemnity Agreement, the Indemnitors further agreed, jointly and severally, to:

> To exonerate, indemnify, hold harmless and keep indemnified [XL] from and against all demands, claims, losses, costs, liabilities, damages, and expenses including, without limitation, attorney's fees, expert's fees, interest, court costs, investigative expenses, document reproduction and storage charges (collectively the "Surety's Loss") which [XL] may sustain or incur by reason of the issuance of the Bonds or Indemnitors' failure to perform or comply with any of the provisions of this Agreement or [XL] attempting to obtain a release of or evidence of termination under such Bonds.
>
> [Id. at ¶ 19, Ex. A at ¶ 3.]

Pursuant to Paragraph 3 of the Indemnity Agreement, the Indemnitors further agreed, jointly and severally, to:

> An itemized, sworn statement by an employee of [XL] or any other evidence of [XL's] Loss shall be prima facie evidence of propriety, amount and existence of Indemnitors liability to [XL]. Indemnitors shall pay to [XL] interest,

including pre and post judgment interest on all disbursements made by [XL] at the maximum rate permitted by law, calculated from the date of each such disbursement.

[Id. at ¶ 20, Ex. A at ¶ 3.]

Pursuant to Paragraph 5 of the Indemnity Agreement, the Indemnitors further agreed, jointly and severally, that:

In order to exonerate and indemnify [XL], to place [XL] in immediately available funds, in a form and amount deemed acceptable in the [XL]'s sole discretion, when requested to do so in order to meet and satisfy any claim, reserve established by [XL], or demand made upon [XL] under the Bonds (whether or not such claims or demands are contested by Indemnitors before [XL] shall be required to make payment under the Bonds). Indemnitors acknowledge that failure of Indemnitors to deposit such funds with [XL] in accordance with this section in the amounts, in a form and at the time demanded by [XL] shall cause irreparable harm for which [XL] has no adequate remedy at law. Indemnitors agree that [XL] shall be entitled to injunctive relief for specific performance of Indemnitors' obligation to deposit funds in accordance with this section and expressly waives and relinquishes any claims or defenses to the contrary.

[Id. at ¶ 21, Ex. A at ¶ 5.]

In Paragraph 8 of the Indemnity Agreement, the Indemnitors also agreed, jointly and severally, that:

[XL] may, at any time and for any reason in its sole discretion, require the Indemnitors upon written notice to immediately procure the full release of the Bonds or deliver to [XL] collateral security in the form acceptable to [XL]. The collateral security will be in an amount equal to 100%

5

of all undischarged liability under all Bonds, which liability shall be determined by [XL] as of the date of written notice.

[Id. at ¶ 22, Ex. A at ¶ 8.]

Pursuant to Paragraph 8 of the Indemnity Agreement, the Indemnitors further agreed, jointly and severally, that:

Indemnitors acknowledge that failure to deposit such funds with [XL] in accordance with this section shall cause irreparable harm for which [XL] has no adequate remedy at law. Indemnitors agree that [XL] shall be entitled to injunctive relief for specific performance of Indemnitors' obligation to deposit funds in accordance with this section and expressly waive and relinquish any claims or defenses to the contrary. Collateral security to be provided to [XL] shall be sent to XL Specialty Insurance Company, 505 Eagleview Blvd., Suite 100, PO Box 636, Exton, PA 19341-0636, Attn: Collateral Manager.

[Id. at ¶ 23, Ex. A at ¶ 4.]

Pursuant to Paragraph 4 of the Indemnity Agreement, the Indemnitors further agreed, jointly and severally, that:

if [XL] (i) receives any claim under any Bonds or (ii) establishes, in its sole discretion, any reserve, the Indemnitors will provide [XL] or its designees access to all records, including all financial records, of the Indemnitors for the purposes of examining and copying same.

[Id. at ¶ 24, Ex. A at ¶ 4.]

6

**B. The Bonds and XL's Exposure**

**i.    The Depcom Project**

Depcom executed a general contract ("Depcom Contract") to perform as general contractor on the project known as "MD70 Richfield Photovoltaic Power Plant" ("Depcom Project"). Id. at ¶ 25.  Subsequent to the execution of the Indemnity Agreement, BCR entered into a subcontract ("Depcom Subcontract") with Depcom to perform work on the Depcom Project.  Id. at ¶ 26.  On or about June 17, 2021, XL, as surety, issued performance and payment bonds, both bearing bond number US00104943SU21A (collectively, the "Depcom Bonds") on behalf of BCR and in favor of Depcom, as obligee, in connection with the Depcom Project. Id. at ¶ 27, Ex. B.

By letter dated October 6, 2021, Depcom issued notice to XL claiming that BCR removed its personnel and began to demobilize its equipment from the Depcom Project. Id. at ¶ 29. Depcom also notified XL that it was aware of at least nine (9) sub-subcontractors and vendors that are owed balances from BCR that are past due. Id. at ¶ 30. According to the schedule of unpaid sub-subcontractors and vendors provided by Depcom, it appears that BCR owes its Depcom subcontractors and vendors more than $1,230,000. Id. at ¶ 31. By letter dated October 21, 2021, Depcom issued a termination notice to BCR terminating the Depcom Subcontract ("BCR Termination"). Id. at ¶ 32.

By letter dated November 5, 2021, counsel for Richfield Farms filed a claim under the Depcom Payment Bond in connection with the Depcom Subcontract. Id. at ¶ 33. By letter dated November 12, 2021, counsel for United Rentals ("United Rentals") asserted a claim against the Depcom Payment Bond for labor and/or materials allegedly supplied to the Depcom Project, in the amount of $265,336.50. Id. at ¶ 34. As a result of the BCR Termination and the claims by Richfield and United Rentals against the Depcom Payment Bond, XL is exposed to liability under its Bonds, and has incurred, and will continue to incur, losses, costs, and expenses, including attorney's fees. Id. at ¶ 35.

### ii.    The Monmouth Project

MYR executed a general contract ("MYR Contract") to perform as general contractor on the Monmouth Project.  Id. at ¶ 36. On or about June 11, 2021, MYR entered into a subcontract ("Monmouth Subcontract") with BCR whereunder BCR agreed to perform work on the Monmouth Project. Id. at ¶ 37.  On or about June 25, 2021, XL, as surety, issued a Subcontract Performance Bond ("Monmouth Performance Bond") and Subcontract Payment Bond ("Monmouth Payment Bond"), both bearing bond no. US00104945SU21A (collectively the "Monmouth Bonds") on behalf of BCR, as principal, and in favor of MYR, as obligee, in connection with the Monmouth Project. Id. at ¶ 38, Ex. C.

8

By letter dated November 30, 2021, MYR issued a Notice of Default of the MYR Subcontract to BCR, copying XL ("MYR Default"). Id. at ¶ 40. Within the MYR Default, MYR demands that certain defects be cured within seven (7) days and, if said defects remain uncured, MYR reserves its right to terminate the Monmouth Subcontract and make a claim against the Monmouth Performance Bond. Id. at ¶ 41. As a result of the MYR Default, XL is exposed to liability under the Monmouth Performance Bond and has incurred, and will continue to incur, losses, costs, and expenses, including attorneys' fees. Id. at ¶ 42.

## C. XL'S Demands Upon the Indemnitors

By letter dated November 11, 2021, XL requested, consistent with the express terms of the Indemnity Agreement, that the Indemnitors post collateral security with XL in the amount of $2,000,000 in connection with Depcom's termination of BCR and the claim asserted by Richfield Farms against the Depcom Payment Bond. Id. at ¶ 43, Ex. D. Despite XL's November 11, 2021 demand letter, the Indemnitors have failed to, among other things, deposit collateral with XL, in material breach of the Indemnitors' joint and several obligations made under the Indemnity Agreement. Id. at ¶ 45. XL, in its November 11, 2021 letter, also demanded that the Indemnitors provide XL with unrestricted access to the Indemnitors' financial statements, books, records, and accounts. Id. at ¶ 46.

9

By letter dated November 17, 2021, XL sent another letter to the Indemnitors wherein XL: (i) advised Indemnitors that Richfield Farms supplied documents in support of its claim and "it appears that Richfield supplied materials to the [Depcom] Project and the amounts claimed are due and owing except for finance charges"; and (ii) reiterated its demand that Indemnitors deposit collateral security.  Id. at ¶ 47, Ex. E.  Between November 17, 2021 and the Thanksgiving holiday, XL attempted to resolve the matter with the Indemnitors without Court intervention, however, Indemnitors refused to provide XL adequate assurances and/or access to their books and records as required under the Indemnity Agreement. Id. at ¶ 48. To date, the Indemnitors have failed to deposit collateral with XL and/or provide access to their financial statements, books, records, and accounts to XL, in material breach of the Indemnitors' joint and several obligations under the Indemnity Agreement.  Id. at ¶ 49.

### THIS APPLICATION IS GOVERNED BY NEW YORK LAW THROUGH AN ENFORCEABLE CHOICE OF LAW PROVISION

New York law applies to this application through an enforceable choice of law provision in the Indemnity Agreement.

The District of Maryland readily enforces choice of law provisions. See Hanover Ins. Co. v. Engineered Sys. All., LLC, 2019 U.S. Dist. LEXIS 32749 (D. Md. 2019) (noting that "Maryland applies 'the law of the jurisdiction where the

contract was made, unless there is a choice of law provision in the contract"); Francis v. Allstate Ins. Co., 709 F.3d 362, 369 (4th Cir. 2013) (enforcing the parties' contractual choice-of-law provisions stating that California law governs); Faltings v. IBM, 1988 U.S. App. LEXIS 19562 (4th Cir. 1988) (giving full effect to a contractual choice-of-law provision and holding that New York governs the enforceability of a contract); Sumanth v. Essential Brands, Inc., 2018 U.S. Dist. LEXIS 11968 (D. Md. January 24, 2018) (applying the parties' choice-of-law provision in a contract and applying Maryland law). Indeed, this District has enforced a New York choice of law provision in an indemnity agreement between a surety and its indemnitors. See Berkley Reg'l Ins. Co. v. Murray 2016 U.S. Dist. LEXIS 6684 (D. Md. January 20, 2016) (enforcing a New York choice of law provision between a surety and its' indemnitors.).

Here, the Indemnity Agreement contains a New York choice of law provision. Indeed, Paragraph 12 of the Indemnity Agreement provides:

> This Agreement shall be governed by the laws of the State of New York, without resort to or application of any conflicts of law doctrine or principles of law.
> [Verified Complaint at Ex. A at ¶ 12.]

To that end, the Court must apply New York law when considering XL's application for preliminary restraints.

## STANDARD FOR TEMPORARY RESTRAINTS AND PRELIMINARY INJUNCTION

11

The criteria for entering a temporary restraining order and preliminary injunction are set forth in Rule 65 of the Federal Rules of Civil Procedure.  In deciding whether a temporary restraining order or preliminary injunctive relief is appropriate, the Court must consider: (1) the likelihood of success on the merits; (2) the extent to which the plaintiff is being irreparably harmed; (3) the balance of the equities; and (4) the extent to which the public interest favors the granting of the requested relief. Senior Executives Ass'n v. U.S., 891 F. Supp. 2d 745, 750 (D. Md. 2012) (quoting Real Truth About Obama, Inc. v. Fed Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009)).

The function of a preliminary injunction is to "maintain the status quo" and prevent irreparable harm while a lawsuit remains pending.  Coastal Labs., Inc. v. Jolly, 2021 U.S. Dist. LEXIS 78548, 34 (D. Md. April 23, 2021) citing Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013) (noting that "'the principal function of a preliminary injunction is to maintain the 'status quo'. That is exactly what this Court seeks to do in this case."). The decision on whether a preliminary injunction is warranted is up to the trial court's sound discretion. Sanderson Farms, Inc. v. Tyson Foods, Inc., 547 F. Supp. 2d 491 (D. Md. April 22, 2008) ("the decision whether to issue a preliminary injunction is committed to the sound discretion of the trial court"); Mayson-Dixon Strategic Consulting, LLC v. Mason-Dixon Polling & Strategic Consulting, Inc., 324

F. Supp. 3d 569 (D. Md. 2018) ("Deciding whether to issue a preliminary injunction is within 'the sound discretion of the trial court.'").

## LEGAL ARGUMENT

## POINT I

## XL WILL SUFFER IRREPARABLE HARM WITHOUT THE REQUESTED RELIEF

XL will undoubtedly suffer irreparable harm in the event the Indemnitors are not compelled to specifically perform under the Indemnity Agreement because XL will be unable to avail itself of its specifically enumerated bargained-for contractual rights, which represent the benefit of the bargain XL reached with the Indemnitors when entering into the Indemnity Agreement and prior to, as an express condition precedent, issuing the Bond. In addition to the rights specifically enumerated in the Indemnity Agreement, XL would also be deprived of its common law right of *quia timet* relief. Accordingly, XL respectfully requests this immediate injunctive relief that compels the Indemnitors to provide XL with collateral security in the amount of $2,000,000 and to provide XL with immediate and complete access to the books and records of all Indemnitors.

It is well recognized, under New York law, that the harm suffered by a surety is immediate and irreparable when it does not obtain specific performance of a collateral security obligation. See Safeco Ins. Co. of Am. v. Hirani/MES, JV, 480 F. App'x 606, 609 (2d Cir. 2012) ("Where a surety 'bargained for collateral security

and…failed to receive it, [the surety]'s injury is real and immediate.'") (quoting American Motorists Ins. Co. v. United Furnace Co., 876 F.2d 293, 302 (2d Cir. 1989)); Colonial Surety Co. v. Eastland Const. Inc., 2009 N.Y. Misc. LEXIS 4167 (N.Y. Sup. Ct. July 30, 2009) (granting injunctive relief to surety after indemnitors failed to post collateral security), aff'd as modified on other grounds. 77 A.D.3d 581 (N.Y. App. Div. 2010); Hartford Fire Ins. Co. v. Saunders Concrete Co. Inc, 2012 U.S. Dist. LEXIS 125116 (N.D.N.Y. Sept. 4, 2012) (granting preliminary injunctive relief to the plaintiff-surety and ordering that the indemnitor-defendants post collateral security according to terms of indemnity agreement); Travelers Cas. & Sur. Co. of Am. v. C.R. Calderon Constr., Inc., 2017 U.S. Dist. LEXIS 77469, 17 (D. Md. May 22, 2017) (granting preliminary injunction and ordering indemnitor to post collateral security in accordance with the terms of the indemnity agreement); Berkley Reg'l Ins. Co., 2016 U.S. Dist. LEXIS 6684 (granting surety's motion for specific performance of collateral security obligation in indemnity agreement).

Absent enforcement of the collateral security obligation, a surety that bargained for this "special" security would find itself relegated to the same status as any other unsecured creditor with respect to the assets of its principal. See American Motorists Ins. Co. v. Pennsylvania Beads Corp., 983 F. Supp. 437, 440-41 (S.D.N.Y. 1997); see also First National Ins. Co. of Am. v. Sappah Brothers Inc, 771 F. Supp. 2d 569, 574-75 (E.D.N.C. 2011) (specifically enforcing collateral security provision

14

and granting surety preliminary injunctive relief); International Fidelity Ins. Co. v. Waterfront Group NC, LLC, 2001 U.S. Dist. LEXIS 11631 at *14 (W.D.N.C. Oct. 6. 2011) (same): International Fidelity Ins. Co. v. Anchor Environmental, Inc, 2008 U.S. Dist. LEXIS 35996 (E.D. Pa. May 1, 2008) (specifically enforcing a collateral security provision and making the surety's preliminary injunctive relief permanent); C.R. Calderon Constr., Inc., 2017 U.S. Dist. LEXIS 77469 (specifically granting the surety's preliminary injunction and enforcing collateral security provision).

A surety's loss of its right to specific performance of a collateral security provision cannot be adequately remedied by monetary damages. See Eakin r. Cont'l Illinois Nat'l Bank & Trust Co. of Chicago, 121 F.R.D. 363, 366 (N.D. III. 1988) (noting that without obtaining specific performance of collateral security obligations, surety would forever lose these rights); C.R. Calderon Constr., Inc., 2017 U.S. Dist. LEXIS 77469, 14-15 (noting that "[m]oney damages are inadequate here, because they cannot compensate [surety] for unduly bearing this risk of non-payment and the loss of its bargained-for security position' as compared to other creditors").

Moreover, the Indemnitors explicitly agreed that if they fail to provide collateral in breach of the Indemnity Agreement, XL will have no adequate remedy at law and that XL will be entitled to specific performance of the Indemnitors' obligations to provide collateral. Specifically, Paragraph 8 of the Indemnity Agreement sets forth in clear and unambiguous language that:

> Indemnitors acknowledge that failure to deposit such funds
> with [XL] in accordance with this section shall cause
> irreparable harm for which [XL] has **no adequate remedy
> at law**. Indemnitors agree that [XL] **shall be entitled to
> injunctive relief for specific performance** of Indemnitors'
> obligation to deposit funds in accordance with this section
> and expressly waive and relinquish any claims or defenses
> to the contrary....

> [Verified Complaint at ¶ 21, Ex. A at ¶ 5 (emphasis added).]

Indeed, absent immediate relief, XL's right to receive collateral will be rendered hollow and meaningless. See Developers Sur. & Indem. Co. v. Bi-Tech Const., Inc., 964 F. Supp. 2d 1304, 1310 (S.D. Fla. 2013) ("Absent an injunction, [the surety] would suffer the harm of having its rights under the Indemnity Agreement effectively nullified. [The surety] would be unsecured against claims and loss while [the indemnitors] would be free to sell, transfer, or conceal their assets to avoid their obligations.") (internal citation omitted). Without the requested relief, XL would be stripped of its rights under the Indemnity Agreement and may effectively be left without a remedy.

XL will undoubtedly suffer irreparable harm if the Indemnitors are not compelled to perform their obligations under the Indemnity Agreement because XL will be unable to avail itself of its contractual rights, which are the benefit of the bargain it reached with the Indemnitors when entering into the Indemnity Agreement and exposing itself under the Bond. Accordingly, immediate relief that compels the Indemnitors to provide XL with collateral security in the amount of $2,000,000, as

well as immediate and full access to the Indemnitors books and records is appropriate and necessary.

## POINT II

### XL WILL UNDOUBTEDLY PREVAIL ON THE MERITS

The strength of XL's claims is evident by the allegations set forth in the Verified Complaint, which demonstrate that XL will undoubtedly succeed on the merits of its claims.

**A.   XL is Contractually Entitled to Receive Collateral Security**

The record before this Court is clear. The Indemnitors agreed to be bound by the Indemnity Agreement and, upon demand, to deposit collateral with XL in connection with any claims under the Bond. Verified Complaint at ¶¶ 21, 23, Ex. A at ¶¶ 5, 8. Depcom terminated BCR, thereby exposing XL to liability under the Depcom Performance Bond. Id. at ¶ 32. Richfield and United Rentals have also asserted claims against the Depcom Payment Bond, and Depcom has indicated at least nine (9) sub-subcontractors who are owed payment from BCR. Id. at ¶¶ 30 & 33-34. In addition, MYR has declared BCR in default of the Monmouth Subcontract, thereby exposing XL to liability under the Monmouth Performance Bond.  Id. at ¶¶ 40-42.

As a result of this exposure, XL demanded that the Indemnitors deposit collateral security in the amount of $2,000,000. Id. at ¶¶ 43, 47, Exs. D & E. Despite

17

demand, the Indemnitors have failed to deposit any collateral security. Id. at ¶ 49. Therefore, as a matter of law, the Indemnitors are contractually obligated to deposit collateral with XL in the amount of $2,000,000.

Courts routinely uphold a surety's right to specific performance of such a collateral security clause in an indemnity agreement, See, e.g., United Furnace Co., 876 F.2d at 300-02 (specifically enforcing collateral security provision by holding that a surety was entitled to summary judgment on its claim for collateral security under the terms of its indemnity agreement with the principal); United States Fidelity & Guaranty Co. v. J United Electrical Contracting Corp., 62 F. Supp. 2d 915, 921-22 (E.D.N.Y. 1999) (granting summary judgment on surety's claim for specific performance of collateral security provision); Employers Ins. of Wausau v. Bond, 1991 U.S. Dist. LEXIS 951 (D. Md. 1991) (noting that "a surety may sue for specific performance for deposit of security to cover the surety's reserve if such a provision is found in the indemnity agreement").

Indeed, it is well settled under New York law that the obligation of the Indemnitors under the Indemnity Agreement to deposit collateral with XL is subject to specific performance. See BIB Constr. Co., Inc., v. Fireman's Ins. Co. of Newark NJ, 214 A.D.2d 521 (N.Y. App. Div. 1995) (reversing denial of surety's summary judgment motion and holding that surety was entitled to specific performance of collateral security provision under terms of an indemnity agreement); Eastland Const.

<u>Inc.</u>, 2009 N.Y. Misc. LEXIS 4167 (specifically enforcing collateral security provision); <u>Colonial Sur. Co., v. Genesee Valley Nurseries, Inc.</u>, 5 A.D.3d 1024 (N.Y. App. Div. 2004); <u>see also</u> <u>Prestige Decorating & Wallcovering, Inc. v. US Fire Ins. Co.</u>, 2007 WL 5555819 (NY. Sup. Ct. May 10, 2007), aff'd, 49 A.D.3d 406 (N.Y. App. Div. 2008) (holding surety entitled to summary judgment for specific performance of collateral security provision in indemnity agreement).

Here, the obligation of the Indemnitors under the Indemnity Agreement to provide XL with collateral security is clear and unambiguous. In Paragraph 8 of the Indemnity Agreement, the Indemnitors expressly agreed that:

> [XL] may, at any time and for any reason in its sole discretion, require the Indemnitors upon written notice to immediately procure the full release of the Bonds or deliver to [XL] collateral security in the form acceptable to [XL]. The collateral security will be in an amount equal to 100% of all undischarged liability under all Bonds, which liability shall be determined by [XL] as of the date of written notice.

> [Verified Complaint at ¶ 20, Ex. A at ¶ 8.]

Accordingly, XL is contractually entitled to receive collateral security from the Indemnitors.

Here, Depcom terminated BCR under the bonded-Depcom Subcontract and Richfield Farms and United Rentals have asserted claim under the Depcom Payment

19

Bond. <u>Id.</u> at ¶¶ 32-33.[1] As a result, XL demanded that the Indemnitors deposit collateral security in connection with these claims in the amount of $2,000,000. <u>Id.</u> at ¶ 42, Exs. D & E. To date, the Indemnitors have failed to comply with XL's demand and have otherwise failed to deposit adequate collateral security commensurate with XL's exposure. <u>Id.</u> at ¶¶ 44, 48. Absent immediate relief, XL's right to receive collateral will be rendered hollow and meaningless, and XL may effectively be left without a remedy.

Based on the plain language of the Indemnity Agreement, XL is entitled, as a matter of law, to immediate injunctive relief that compels the Indemnitors to post collateral with XL.

## B. XL is Contractually Entitled to Access the Indemnitors' Books and Records

Courts routinely enforce similar provisions and require that indemnitors provide a surety with free access to their books and records pursuant to the strict terms of a written indemnity agreement, <u>See</u> <u>Hartford Casualty Ins. Co. v. Cal-Tran Assocs., Inc.</u>, 2008 U.S. Dist. LEXIS 71736 (D.N.J. Sept. 4, 2008) (enforcing surety's right to inspect books and records pursuant to terms of indemnity agreement); <u>Eastland Const. Inc.</u>, 2009 N.Y. Misc. LEXIS 4167 (interpreting indemnity agreement and ordering

---

[1] On November 12, 2021, XL received a claim by United Rentals against the Depcom Payment Bond.  Id. at ¶ 34.  Moreover, on November 30, 2021, XL was made aware of a Notice of Default by MYR, Subcontract to BCR on the Monmouth Project, creating additional exposure for XL. <u>Id.</u> at ¶ 39

indemnitors to provide surety with immediate access to books and records); Travelers Casualty & Surety Co. of Am. v. J.O.A. Constr. Co., 2009 U.S. Dist. LEXIS 30553 (E.D. Mich. Mar. 31, 2009) (ordering indemnitors to provide surety with immediate access to books, records, and accounts); U.S. v. JMG Excavating & Constr. Co., Inc., 2004 U.S. Dist. LEXIS 13334 (D. Me. Jul. 16, 2004) (upholding a provision in an indemnity agreement stating that "the Surety shall have right of free access to the books, records, and accounts of the [Indemnitors] for the purpose of examining and copying them"); RLI Ins. Co. v. Commercial  Money Center, Inc., 2002 U.S. Dist. LEXIS 29232 (S.D. Cal. Jun. 6, 2002) (upholding a provision in an indemnity agreement that provided that indemnitor was required to make all accounting books and records available to surety); Colonial Sur. Co. v. A&R Capital Assocs., 420 F. Supp. 3d 38 (E.D.N.Y. 2017) (noting that "Courts have enforced similar provisions in indemnity agreements, requiring indemnitors to provide a surety with access to their books and financial records.").

Here, the Indemnitors agreed and acknowledged, in Paragraph 4 of the Indemnity Agreement, to:

> provide the Surety or its designees access to all records, including all financial records, of the Indemnitors for the purposes of examining and copying same.
>
> [Verified Complaint at ¶ 22, Ex. A at ¶ 4.]

21

As XL has not been discharged of its obligations under the Bond, the Indemnity Agreement unequivocally provides that XL must be afforded immediate unrestricted access to the Indemnitors' books, records, and accounts.

Thus, based on the express language of the Indemnity Agreement, XL is entitled to have access to the books and records of the Indemnitors. This right must be immediately compelled to prevent the Indemnitors' possible destruction and manipulation of their relevant books and records. Moreover, inspection is necessary in order to prevent the possible transfer of certain assets which will be used to satisfy the Indemnitors obligations under the Indemnity Agreement. In the event that records are destroyed or altered, or assets are transferred, XL's rights under the Indemnity Agreement and the Bond would be significantly impaired, thus leaving XL without an adequate remedy. Accordingly, immediate relief that compels the Indemnitors to give XL complete access to their books and records is appropriate and necessary.

## C.   XL is Entitled to *Quia Timet* Relief

As a result of the BCR Termination, MYR Default and Richfield's and United Rentals' claims against the Depcom Payment Bond (in addition to additional anticipated claims against the Bonds), XL has a right to immediately enforce its indemnification and exoneration rights through specific performance of the collateral security clause in the Indemnity Agreement through *quia timet* relief. *Quia timet* relief is much broader than exoneration. The term *quia timet* is a Latin phrase meaning

"because he fears." Quia Timet, Black's Law Dictionary (9th ed. 2009) (noting that quia timet is "the right to be protected against anticipated future injury that cannot be prevented by the present action").

In the surety context, *quia timet* relief is the right of a surety to demand that the principal place the surety "in funds" when there are reasonable grounds to believe that the surety will suffer a loss in the future because the principal is likely to default on its primary obligation to the creditor. See City of New Orleans v. Christmas, 131 U.S. 191, 212 (1889) (noting that under a bill quia timet, "a surety may file a bill to compel the debtor on a bond in which he has joined to pay the debt when due, whether the surety has been actually sued for it or not"); see also In re Gas Reclamation, Inc. Sec. Litigation 741 F. Supp. 1094 (S.D.N.Y. 1990) (noting that "Quia timet is the right of the surety to compel its principal to place the surety in funds sufficient to prevent anticipated future losses, where a surety has reasonable grounds to believe that its principal will not perform his obligations").

Here, the express terms of Paragraph 3 of the Indemnity Agreement provide that the Indemnitors agreed to:

> exonerate, indemnify, hold harmless and keep indemnified the Surety from and against all demands, claims, losses, costs, liabilities, damages, and expenses including, without limitation, attorney's fees, expert's fees, interest, court costs, investigative expenses, document reproduction and storage charges (collectively the "Surety's Loss") which the Surety may sustain or incur by reason of the issuance of the Bonds or Indemnitors' failure to perform or comply with

23

> any of the provisions of this Agreement or Surety
> attempting to obtain a release of or evidence of termination
> under such Bonds.

[See Verified Complaint, ¶ 17, Ex. A at ¶ 3.]

Since there have been claims made against the Bond (the BCR Termination, MYR Default and Richfield's and United Capitals' claims against the Depcom Payment Bond) exposing XL to potential losses and expenses of $2,000,000, this case is uniquely situated for *quia time*t relief and specific enforcement of the collateral security provision of the Indemnity Agreement.

## POINT III

### THE INDEMNITORS WILL SUFFER NO HARM IF THE REQUESTED RELIEF IS GRANTED

Unlike the harm that XL will suffer, the Indemnitors will not suffer any harm in the event the injunction is granted. A balancing of the hardships between XL and the indemnitors establishes that XL will suffer substantial harm if the relief is not granted, and that the Indemnitors will suffer no harm if the injunctive relief is granted. See Liberty Mut. Ins. Co. v. Aventura Eng'g & Const. Corp., 534 F. Supp. 2d 1290, 1321 (S.D. Fla. 2008) ("[A] surety's loss of its right to collateralization cannot be adequately remedied through monetary damages"). Indeed, if the requested relief is granted, the Indemnitors will be required to do nothing more than that which they contractually agreed. See Int'l Fid. Ins. Co. v. Anchor Envt'l, Inc., 2008 U.S. Dist.

24

LEXIS 35996 at *23 (E.D. Pa. May 1, 2008) (granting preliminary and permanent injunction to surety against indemnitors and noting that the indemnitors "are not unfairly prejudiced by being held to the Agreement of Indemnity to which they were signatories").

Even if the Indemnitors were to argue that they would suffer the harm of financial hardship, this would not be an appropriate basis for denying the relief XL seeks. See Am. Motorists Ins. Co. v. Pennsylvania Beads Corp., 983 F. Supp. 437, 440-41 (S.D.N.Y. 1997). In Pennsylvania Beads Corp., the court noted that the indemnitors' claim that they would suffer undue financial hardship does not justify denying the surety its contractual right to collateral security:

> The only remaining support for [indemnitor's] public policy argument is its unsubstantiated claim that the financial hardship which would result from enforcement of the Indemnity Agreement would bankrupt [indemnitor] "needlessly." While that possible outcome would indeed be unfortunate, it does not, standing alone, provide a valid justification for denying [surety] access to the security it specifically bargained for. In fact, absent enforcement of the Indemnity Agreement's collateral security clause, [the surety] could-in the bankruptcy situation contemplated by [indemnitor]-be relegated to an unsecured claim and therefore be forced to share its debtor's property with other creditors. If anything, public policy considerations dictate against such a result since it is that precise situation which [the surety] sought to avoid in bargaining for the collateral security clause.

> [Id. at 441.]

25

Thus, the Indemnitors will suffer no harm by being compelled to perform that for which they are primarily obligated.

## POINT IV

### THE PUBLIC INTEREST WEIGHS IN FAVOR OF THE COURT ORDERING THE REQUESTED RELIEF

"Where a party demonstrates both the likelihood of success on the merits and irreparable injury, 'it almost always will be the case that the public interest will favor' the issuance of an injunction." See Marsellis-Warner Corp. v. Rabens, 51 F.Supp.2d at 508, 532-33 (D.N.J. 1999) ((quoting American Telephone and Telegraph, Co., 42 F.3d at 1421, 1427 (3d Cir 1994)). Furthermore, surety companies perform an important public service function in this country. Surety companies secure the performance of countless governmental construction and other contracts and thereby provide to the public a measure of security and certainty that contractual undertakings will be fulfilled. Surety companies issue bonds, in substantial part, based on the strength of their rights as sureties. These rights, including those discussed herein, of immediate injunctive relief for contractual and common law indemnification, and *quia timet*, the right to compel defaulting principals to post collateral, and the right to obtain the use of contract funds, must be enforced. Any failure to grant surety companies their rightful measure of these rights may result in a withdrawal of sureties from the market and may eventually take from the public the security surety

26

companies afford. See Anchor Environmental, Inc., 2008 U.S. Dist. LEXIS 35996 at *21 (E.D. Pa. May 1, 2008) (finding that the "issuance of a preliminary injunction furthers the public interest by recognizing and enforcing the plain language of a binding surety indemnification agreement").

Enforcement of the rights herein sought to be enforced will serve an important public purpose. These public interest factors, like all of the factors in determining whether to grant a preliminary injunction, weigh heavily in favor of granting XL the relief it seeks.

## POINT V

### THE DECISION OF THE SUPREME COURT OF THE UNITED STATES IN *GRUPO MEXICANO V. ALLIANCE BOND FUND, INC.* DOES NOT PRECLUDE THIS COURT FROM GRANTING XL'S APPLICATION

Grupo Mexicano v. Alliance Bond Fund, Inc., 527 U.S. 308 (1999), is the seminal case regarding the inherent equitable power of a district court to grant a preliminary injunction and freeze a defendant's assets. In Grupo Mexicano, the Supreme Court held that the inherent equitable power of a district court does not include the power to issue injunctions that freeze a defendant's assets when the plaintiff seeks **only** money damages. See Grupo Mexicano, supra, 527 U.S. at 333 (emphasis added).

27

Prior to <u>Grupo Mexicano</u>, however, courts routinely granted injunctions freezing a defendant's assets in cases where the plaintiff sought both legal and equitable remedies. <u>See</u> <u>Levi Strauss & Co. v. Sunrise Int'l. Trading, Inc.</u>, 51 F.3d 982, 987 (11th Cir. 1995) (affirming district's courts order freezing assets where plaintiff sought preliminary and permanent injunctions and damages); <u>Republic of the Philippines v. Marcos</u>, 862 F.2d 1355, 1364 (9th Cir. 1988) (court had authority to issue a preliminary injunction "to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies" where plaintiff brought RICO damage claims and sought a constructive trust); <u>Federal Savings & Loan Ins. Corp. v. Dixon</u>, 835 F.2d 554, 557 (5th Cir. 1987) (upholding preliminary injunction when plaintiff sought damages, an accounting, a constructive trust, and injunctive relief).

Despite <u>Grupo Mexicano</u>, courts continue to recognize that they retain the power to issue injunctions freezing a debtor's assets when the plaintiff seeks both legal *and* equitable relief. <u>See</u> <u>Rahman v. Oncology Assoc., P.C.</u>, 198 F.3d 489, 495 (4th Cir. 1999); <u>Newby v. Enron Corp.</u>, 188 F. Supp 2d 684 (S.D. Texas 2002); <u>Quantum Corp. Funding, Ltd. V. Assist You Health Care Serv. Of Virginia</u>, 144 F. Supp.2d 241, 250 (S.D.N.Y. 2001); <u>National Union Fire Ins. Co. v. Kozeny,</u> 115 F. Supp.2d 1243, 1250 (D. Colo. 2000); <u>Sweet People Apparel, Inc. v. Fame of NY, Inc.,</u> 2011 U.S. Dist. LEXIS 78336 (D. N.J. July 19, 2011); <u>Gucci America, Inc. v. Weixing Li,</u> 2012 U.S. Dist. LEXIS 171520 (S.D.N.Y. Aug. 23, 2011).

Moreover, an examination of Grupo Mexicano and preceding Supreme Court decisions regarding injunctions freezing a defendant's assets reveals that Grupo Mexicano does not prohibit this Court from granting XL's request for specific performance, and *quia timet* relief. For instance, in Deckert v. Independence Shares Corp., 311 U.S. 282 (1940), the plaintiffs alleged that the defendants committed acts of fraudulent misrepresentation and concealment in connection with the sale of securities to plaintiffs. The plaintiffs requested, among other things, restitution of the amounts paid for the securities and an injunction restraining the transfer or disposition of any corporate assets, which the court granted. Id. at 286. The Supreme Court affirmed the district court's power to enter the injunction because in addition to money damages, the suit sought the equitable remedies of rescission and restitution, and a preliminary injunction would be "in aid of the recovery sought by the bill." Id. at 289.

In Grupo Mexicano, an action involving a claim *only* for money damages, the Supreme Court concluded that Deckert was "not on point" because the "bill state[d] a cause [of action] for equitable relief." Grupo Mexicano, 527 U.S. at 325. The Supreme Court further distinguished Deckert when it stated that "[t]he preliminary relief available in a suit seeking equitable relief has nothing to do with the preliminary relief available in a creditor's bill seeking equitable assistance in the collection of a legal debt." Id.

In Rahman, supra, a post-Grupo Mexicano case, the Fourth Circuit Court of Appeals addressed the issue of whether "the district court was authorized to enter a preliminary injunction freezing assets in furtherance of the alleged equitable relief claimed in an action where substantial money damages are also claimed." Rahman, 198 F.3d at 495. Following an extensive analysis of both Deckert and Grupo Mexicano, the court affirmed the district court's conclusion that when "both money damages and equitable relief are sought...the controlling authority is not Grupo but Deckert." Id. at 492. The court emphasized that "Grupo Mexicano's holding is carefully circumscribed, providing specifically that the general equitable powers of the federal courts do not include the authority to issue preliminary injunctions in actions solely at law" and that the Grupo Mexicano court "was not presented with, nor did it choose to address, a situation in which equitable remedies were claimed." Id. at 496. See also In re: Focus Media, Inc., 387 F. 3d 1077 (9th Cir. 2004) (holding that Grupo Mexicano's holding does not preclude preliminary injunctions when a plaintiff pleads a legal and equitable cause of action); SEC v. ETC Payphones, Inc., 408 F. 3d 727 (11th Cir. 2005); SEC v. Cavanagh, 445 F. 3d 105 (2d. Cir. 2006).

In this action, XL seeks both legal and equitable relief. XL seeks a legal remedy in the form of an order compelling the Individual Indemnitors to immediately indemnify XL for the losses it sustained as a result of issuing the Bond to BCR and the equitable remedies of access to the Individual Indemnitors' books and records and

the enforcement of its specific performance rights to require the Individual Indemnitors to immediately post collateral in order to satisfy XL's *quia timet* rights. As the court stated in <u>Rahman</u>, when, as here, a plaintiff seeks both legal and equitable remedies, <u>Deckert</u>, rather than Grupo Mexicano, is the controlling authority. Accordingly, <u>Grupo Mexicano</u> does not prohibit the relief sought by XL.

## **CONCLUSION**

Without injunctive relief, XL will only win a pyrrhic victory when it undoubtedly, but eventually, prevails on its claims for equitable and contractual relief because, by that time, the Indemnitors will be unable to provide the funds that will furnish the *quia timet* and exoneration relief. For the foregoing reasons, XL respectfully requests that the Court grant the relief sought in the proposed order with temporary restraints and mandatory injunction submitted herewith.

DATED: December 1 , 2021       TRIF AND MODUGNO, LLC
*Attorneys for Plaintiff*
*XL Specialty Insurance Company*

Kevin Brotspies, Esq.
89 Headquarters Plaza
North Tower, Suite 1201
Morristown, New Jersey 07960
Telephone: 973-547-3611
Facsimile: 973-554-1220