# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| XL SPECIALTY INSURANCE CO., | * | |
| Plaintiff, | * | |
| v. | * | Civil No.   21-3068-BAH |
| BIGHORN CONSTRUCTION & RECLAMATION, LLC, et al., | * | |
| Defendants. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM OPINION</u>

Before the Court is Plaintiff XL Specialty Insurance Company's ("XL" or "Surety" or "Indemnitee" or "Plaintiff") Emergent Motion for Temporary and Preliminary Injunctions (the "Motion"), filed on December 1, 2021. Pl.'s Mot., ECF 2. In the Motion, Plaintiff asks that this Court order the defendants to, *inter alia*, deposit collateral with Plaintiff, or, in the alternative, prohibit the defendants from transferring "any assets" in the event that the defendants do not post that collateral. Pl.'s Mem. Supp. Mot. 2, ECF 2-1. After considering the Motion and all related papers, the Court finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). Accordingly, for the reasons set forth below, Plaintiff's Motion is **GRANTED** in part and **DENIED** in part.

## I.        FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is an insurance company that is incorporated under Delaware state law and maintains its principal place of business in the state of Connecticut. Plaintiff's business consists of issuing performance and payment bonds on behalf of construction contractors.

The defendants are eight corporations allegedly[1] incorporated under Texas state law, all of which maintain principal places of business in Texas, and three individuals residing in Texas: (1) Bighorn Construction and Reclamation, LLC ("BCR"), (2) Bighorn Investments and Properties, LLC ("Bighorn Investments and Properties"), (3) Bridgelink Engineering, LLC ("Bridgelink Engineering"), (4) Bridgelink Commodities, LLC ("Bridgelink Commodities"), (5) Bridgelink Investments, LLC ("Bridgelink Investments"), (6) Bridgelink Development, LLC ("Bridgelink Development"), (7) Bridgelink Renewable Energy Investments, LLC ("Bridgelink Renewable"), (8) Intermountain Electric Service, Inc. ("Intermountain Electric"), (9) Cole W. Johnson, (10) Cord H. Johnson, and (11) Cassie J. Hamilton (collectively, "Indemnitors" or "Defendants").  Compl. ¶¶ 4–14, ECF 1; Pl.'s Mot. 1, ECF 2.  Plaintiff alleges that "BCR, at all relevant times, was engaged in the construction contracting business."  Compl. ¶ 15, ECF 1; Defs.' Answer ¶ 15, ECF 15.

This case centers on two construction projects involving BCR, the technical details of which are not relevant to the matter before the Court.  On June 11, 2021, BCR entered into a subcontract with MYR Energy Services, Inc. ("MYR") relating to BCR's agreement to perform work on the Monmouth Solar Project ("Monmouth Project").  Compl. ¶ 37, ECF 1; Defs.' Answer ¶ 37, ECF 15.  BCR later entered into a subcontract" with Depcom Power, Inc. ("Depcom") relating to work BCR agreed to perform related to the MD70 "Richfield" project ("Depcom Project").  Compl. ¶ 26, ECF 1; Defs.' Answer ¶ 26, ECF 1.  As part of its involvement with these projects, BCR was required to provide Depcom and MYR payment and performance bonds, which BCR secured through an agreement with Plaintiff.

---

[1] Plaintiff alleges that each of the corporate Defendants are organized and existing under the law of Fort Worth, Texas[.]"  Compl. ¶¶ 4–11, ECF 1.  Defendants deny Plaintiff's allegations regarding the place of incorporation as to certain corporate Defendants.  *See* Defs.' Answer ¶¶ 4–5, 7, 9–11, ECF 15.

On June 25, 2021, Plaintiff and Defendants executed a General Agreement of Indemnity ("Indemnity Agreement")[2] "[i]n consideration for and in order to induce XL, as surety, to issue bonds on behalf of BCR as principal . . . ."  Compl. ¶ 17, ECF 1.  Put another way, the parties entered into the Indemnity Agreement "for the purpose of indemnifying the Surety in connection with any Bonds[3] . . . previously or hereafter executed or procured for, on or on behalf of, or at the request of any Indemnitors."  Indemnity Agreement at 1.  On the same day, BCR, as principal, and XL, as surety, executed payment and performance bond subcontracts with Depcom[4] and MYR[5] as obligees, respectively.

On October 6, 2021, Depcom sent Plaintiff a letter, informing them that BCR had removed its personnel from the Depcom Project site and began to demobilize its equipment from the Project.  Compl. ¶ 29, ECF 1.  Plaintiff also alleges that it was notified by Depcom that Depcom was aware of at least nine sub-subcontractors and vendors that are owed past-due balances from BCR.  Compl. ¶ 30, ECF 1.  Plaintiff alleges that Depcom subsequently issued a termination notice to BCR, thereby terminating the Depcom Bond Subcontract.  Compl. ¶ 31, ECF 1.  On November 5, 2021, a sub-subcontractor to the Depcom Project, Richfield Farms LLC ("Richfield") sent Plaintiff a

---

[2] The Indemnity Agreement is attached to the Complaint as Exhibit A.  Compl., Ex. A, ECF 1-1 [hereinafter the "Indemnity Agreement"].

[3] The parties agree that the term "Bonds" "shall include any and all bonds, undertakings, contracts of suretyship, reimbursement agreements, guaranty or indemnity, or other writings obligatory in nature, and any renewals or extensions thereof executed by Surety or at the request of Indemnitors . . ."  Indemnity Agreement at 1.

[4] The subcontract related to the Depcom Project payment bond in the amount of $5,551,473.00 and performance bond for the same amount are attached to the Complaint as Exhibit B.  Compl., Ex. B, ECF 1-2 [hereinafter "Depcom Bond Subcontract"].

[5] The subcontract related to the Monmouth Project performance bond of $853,469.22 and payment bond for the same amount is attached to the Complaint as Exhibit C.  Compl., Ex. C, ECF 1-3 [hereinafter "MYR Bond Subcontract"].

letter, providing notice of a claim for $300,258.49 due under the Depcom Bond Subcontract for amounts owed to Richfield for material provided to the Depcom Project.[6] *See* Compl., Ex. D at 8–9, ECF 1-4 (Richfield's Nov. 5, 2021 Letter to Plaintiff).

On November 11, 2021, Plaintiff sent Defendants a letter that, *inter alia*, notified them of Richfield's claim, in addition to Plaintiff's pending request that Defendants deposit collateral with Plaintiff. *See* Compl., Ex. D at 1–6, ECF 1-4 (Plaintiff's Nov. 11, 2021 Letter to Defendants). Plaintiff issued a second letter to Defendant noting the same on November 17, 2021. *See* Compl., Ex. E, ECF 1-5 (Plaintiff's Nov. 17, 2021 Letter to Defendants).

On November 30, 2021, MYR sent a "Notice of Default" of the BCR subcontract to BCR, copying XL. Compl. ¶ 40, ECF 1; Defs.' Answer ¶ 40, ECF 15. Plaintiff avers that Plaintiff "is exposed to liability under the Monmouth Performance Bond and has incurred, and will continue to incur, losses, costs, and expenses, including attorneys' fees." Compl. ¶ 42, ECF 1.

### A.  The Complaint

On December 1, 2021, Plaintiff filed a verified complaint (hereinafter the "Complaint"), alleging that Defendants are in material breach of "the Indemnitors' joint and several obligations under the Indemnity Agreement" by failing to deposit collateral with Plaintiff and/or provide Plaintiff access to Defendants' "financial statements, books, records, and accounts[.]" Compl. ¶ 49, ECF 1. Relevant portions of the Indemnity Agreement state that Defendants, "jointly and severally, agree with Surety as follows":

> **3. <u>INDEMNITY TO SURETY</u>** - To exonerate, indemnify, hold harmless and keep indemnified the Surety from and against all demands, claims, losses, costs, liabilities, damages, and expenses, including, without limitation, attorney's fees,

---

[6] In addition to Richfield's letter, Plaintiff alleges that they received a letter from United Rentals, another claimant under the Depcom Bond Subcontract, asserting a claim against the Bond for "labor and/or materials allegedly supplied to the Depcom Project, in the amount of $265,336.50." Compl. ¶ 34, ECF 1.

expert's fees, interest, court costs, investigative expenses, document reproduction and storage charges (collectively the "Surety's Loss") which the Surety may sustain or incur by reason of the issuance of the Bonds or Indemnitors' failure to perform or comply with any of the provisions of this Agreement or Surety attempting to obtain a release of or evidence of termination under such Bonds.  An itemized, sworn statement by an employee of Surety or any other evidence of Surety's Loss shall be prima facie evidence of propriety, amount and existence of Indemnitors liability to Surety.  Indemnitors shall pay to Surety interest, including pre and post judgment interest on all disbursements made by Surety at a maximum rate permitted by law, calculated from the date of each disbursement.

**4. BOOKS AND RECORDS** - That if the Surety (i) receives any claim under the Bonds or (ii) establishes, in its sole discretion, any reserve, the Indemnitors will provide the Surety or its designees access to all records, including all financial records, of the Indemnitors for the purposes of examining and copying same.

**5. PLACE IN FUNDS** -  In order to exonerate and indemnify the Surety, to place the Surety in immediately available funds, in a form and amount deemed acceptable in the Surety's sole discretion, when requested to do so in order to meet and satisfy any claim, reserve established by Surety, or demand made upon the Surety under the Bonds (whether or not such claims or demands are contested by Indemnitors before the Surety shall be required to make payment under the Bonds). Indemnitors acknowledge that failure of Indemnitors to deposit such funds with Surety in accordance with this section in the amounts, in a form and at the time demanded by Surety shall cause irreparable harm for which Surety has no adequate remedy at law. Indemnitors agree that Surety shall be entitled to injunctive relief for specific performance of Indemnitors' obligation to deposit funds in accordance with this section and expressly waives and relinquishes any claims or defenses to the contrary.

. . .

**8. PLACE IN COLLATERAL** - The Surety may, at any time and for any reason in its sole discretion, require the Indemnitors upon written notice to immediately procure the full release of the Bonds or deliver to the Surety collateral security in the form acceptable to the Surety. The collateral security will be in an amount equal to 100% of all undischarged liability under all Bonds, which liability shall be determined by Surety as of the date of written notice. Indemnitors acknowledge that failure to deposit such funds with Surety in accordance with this section shall cause irreparable harm for which Surety has no adequate remedy at law. Indemnitors agree that Surety shall be entitled to injunctive relief for specific performance of Indemnitors' obligation to deposit funds in accordance with this section and expressly waive and relinquish any claims or defenses to the contrary. Collateral security to be provided to the Surety shall be sent to XL Specialty Insurance Company, 505 Eagleview Blvd., Suite 100, PO Box 636, Exton, PA 19341-0636, Attn: Collateral Manager.

Indemnity Agreement at ¶¶ 3–5, 8.

The Complaint asserts a total of seven claims, four of which are alleged against all Indemnitors (specific performance to enforce XL's demand for collateral security (First Count); specific performance to inspect the books and records (Second Count); contractual indemnification (Third Count); and *quia timet* (Fifth Count)); and three claims solely against BCR (exoneration (Fourth Count); common law indemnification (Sixth Count); and subrogation (Seventh Count)). Compl. ¶¶ 50–81, ECF 1.  Defendants filed an answer to the Complaint on February 3, 2022. Defs.' Answer, ECF 15.

### B.  The Motion

Also on December 1, 2021, Plaintiff filed the Motion presently before the Court, along with an accompanying memorandum of law in support of the Motion, ECF 2-1, and a proposed order, ECF 2-2.  Plaintiff originally sought collateral in the amount of $2,000,000.  Pl.'s Mem. Supp. Mot. 10, ECF 2-1.

On December 8, 2021, the parties filed a joint motion seeking "a continuance of deadlines and suspension of deadlines in which Defendants must respond to [the Motion] for thirty (30) days" to "allow the parties to maximize recoveries and diminish outstanding liabilities."  Joint Mot. ¶ 4, ECF 8.  The joint motion added that "[a]ll counsel understand that, while XL is agreeing to suspend Defendants' response deadlines and engage in a collaborative process to resolve claims, it is doing so without waiving its argument that it currently faces immediate and irreparable harm if it is unable to resolve all pending and future claims during the collaborative process."  *Id.* at ¶ 6. Judge Russell granted the joint motion and set January 10, 2022, as the new deadline by which Defendants were to respond to the Motion and submit a joint status report if further modification of the deadlines was needed."  Russell, J., Dec. 9, 2021 Ord., ECF 10.

Defendants timely responded that Plaintiff provided "no breakdown whatsoever" justifying that amount.  Defs.' Reply to Mot. 3, ECF 11.  In Plaintiff's reply to Defendants' response, Plaintiff reduced the collateral amount to $698,412.78 and provided a more detailed accounting, but indicated that this figure might change again depending on additional claims.  Pl.'s Proposed Ord. 2, ECF 12-2.  Plaintiff has since revised the amount of their request for collateral to $500,647.95. *See* Pl.'s May 6, 2022 Ltr. 1, ECF 31.

Plaintiff's Motion also requested that the Court order Defendants to provide "full and complete access to all of [Defendants'] books, records, and other documents, including financial book, records, documents and accounts maintained by them or any of them in which they may have an interest in inspection and copying."  Pl.'s Proposed Ord. 3, ECF 12-2.  Defendants did not respond to this demand.

On April 22, 2022, the Court requested supplemental briefing on the following: (1) for Plaintiff to clarify the dollar amount of Plaintiff's request for collateral and a brief explanation of how that figure was calculated; (2) for Plaintiff to clarify whether the relief requested is limited to "an amount equal to 100% of all undischarged liability" per paragraph 8 of the Indemnity Agreement; (3) for each party to address the status of Plaintiff's request to inspect books and records, specifically if the discovery process has obviated the need for this relief; and (4) for both parties to explain what impact, if any, a previously scheduled settlement conference scheduled before Judge Maddox might have on the Motion.  *See* Apr. 22, 2022 Ord., ECF 30.  The parties submitted timely responses, ECF 31, 34, and the matter is now ripe for disposition.

## II.   <u>LEGAL STANDARD</u>

Plaintiff seeks preliminary injunctive relief under Rule 65.  Fed. R. Civ. P. 65(a).  "A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent

irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S.Ct. 2080, 2087 (2017) (internal citation omitted). The Fourth Circuit has recognized that "[i]t is well established . . . that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (citing *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992)). Furthermore, "[a] court must ensure a preliminary injunction is 'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Id.* (quoting *Madsen v. Women's Health Ctr, Inc.*, 512 U.S. 753, 765 (1994)).

A party seeking a preliminary injunction or a temporary restraining order ("TRO") must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Real Truth About Obama v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *cert. granted, vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part on remand sub nom. The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010) (per curiam)[7] ; *Ass'n of Cmty. Cancer Centers v. Azar*, 509 F.3d 482, 493 (D. Md. 2020); *XL Specialty Ins. Co.*

---

[7] "Prior to 2009, the Fourth Circuit followed a 'balance of hardship' approach to preliminary injunctions considering all four *Winter* factors, but 'allow[ing] each requirement to be conditionally redefined in a 'flexible interplay' depending on how the other requirements were met. . . . However, *Real Truth* invalidated this approach, and it 'may no longer be applied' in the Fourth Circuit. . . .  As a result, the plaintiff must satisfy each requirement as articulated." *GlaxoSmithKline, LLC v. Brooks*, 2022 WL 463070, at *3 (D. Md. Feb. 15, 2022) (internal citations omitted).

*v. Truland*, No. 1:14cv1058 (JCC/JFA), 2014 WL 4230388, at *4 (E.D. Va. Aug. 21, 2014);

*Maages Audiotorium v. Prince George's Cty., Md.*, 4 F.Supp. 3d 752, 760 n.1 (D. Md. 2014)

(standard for TRO is the same as for a preliminary injunction), *aff'd*, 681 Fed. App'x 256 (4th Cir.

2017).[8]  Each of the preliminary injunction factors must be "satisfied as articulated."  *Pashby v.*

*Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (citing *Real Truth About Obama*, 575 F.3d at 347); *BCR*

*Uluslararasi Taahut ve Ticaret A.S. v. Lexon Ins. Co.*, Civil Action No. 8:19-cv-00771-PX, 2020

WL 6801933, at *12 (D. Md. Nov. 19, 2020).  "Although Plaintiffs 'need not establish a "certainty

of success,"' they must 'make a clear showing that [they are] likely to succeed at trial.'"  *Roe*, 947

F.3d at 219 (quoting *Di Biase*, 872 F.3d at 230 (quoting *Pashby*, 709 F.3d at 321)).

## III.   ANALYSIS

### A.  Jurisdiction and Venue

As a threshold matter, this Court has diversity jurisdiction over this case because the parties

are citizens of different states and the amount in controversy exceeds the sum or value of

$75,000.00.  28 U.S.C § 1332(a); Compl. ¶ 1, ECF 1.  Venue is proper in the District of Maryland,

as it is where a substantial part of the events giving rise to the claims occurred.[9]  28 U.S.C. §

1391(b)(2); Compl. ¶ 2, ECF 1.  Furthermore, this case was referred to a United States Magistrate

---

[8] For an explanation on how a difference in notice to the nonmoving party as well as the duration of the injunction distinguishes a preliminary injunction from a TRO, see *GlaxoSmithKline, LLC*, 2022 WL 463070, at *2–3.

[9] Plaintiff alleged that the District of Maryland is the proper venue "[to] the extent it is the location where a substantial part of the events giving rise to the claim occurred," which Defendants admitted in their Answer.  Compl. ¶ 2, ECF 1; Defs.' Answer ¶ 2, ECF 15.  Though the Court is unable to determine from the pleadings where events related to the Monmouth Project occurred, the Court acknowledges that the events related to the Depcom Project took place in Dorchester County, Maryland, supporting that the District Court of Maryland is the proper venue pursuant to 28 U.S.C. § 1391(b)(2).

Judge for said District for all proceedings and the entry of judgment by the consent of the parties.[10]
*See* 28 U.S.C. § 636(c); Loc. R. 301, 302 (D. Md. 2021); Pl.'s Consent Form, ECF 22; Defs.'
Consent Form, ECF 24.

### B. Preliminary Injunction

The Fourth Circuit has held that "courts considering whether to impose preliminary
injunctions must separately consider each *Winter* factor." *Pashby*, 709 F.3d at 321.  As such, the
Court will consider each *Winter* factor in turn.

#### 1.  Likelihood of success on the merits

The Fourth Circuit has held that a preliminary injunction may be granted when a moving
party that alleges multiple causes of action is likely to succeed on at least one of said claims.  *See,
e.g.*, *Roe*, 947 F.3d at 219, 224 (citing *League of Women Voters v. North Carolina*, 769 F.3d 224,
237–38 (4th Cir. 2014)); *XL Specialty Ins. Co.*, No. 1:14cv1058 (JCC/JFA), 2014 WL 4230388,
at *2 ("Where multiple causes of action are alleged, Plaintiff need only show likelihood of success
on one claim to justify injunctive relief.").  Accordingly, the Court focuses its analysis on whether
Plaintiff makes a clear showing that it is likely to succeed on its claim for "specific performance
of the Indemnity Agreement to enforce XL's demand for collateral security against the
Indemnitors" ("First Count") at trial.  Compl. ¶¶ 50–55, ECF 1.

This Court, sitting in diversity, must first determine which state law governs the dispute by
looking to the choice-of-law principles of the forum state, Maryland.  *See, e.g.*, *Klaxon v. Stentor
Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Lexon Ins. Co.*, Civil Action No. 8:19-cv-00771-PX,
2020 WL 6801933, at *12; *Branhaven, LLC v. BeefTek, Inc.*, 965 F. Supp. 2d 650, 664 (D. Md.

---

[10] This case was assigned to District Judge George L. Russell, III for all proceedings from
December 1, 2021, to March 17, 2022, when the case was reassigned to the undersigned by an
order signed by Judge Russell.  *See* Russell, J., Referral Ord., ECF 26.

2013) ("When a claim is based on state law, the choice of law rules are those of the state in which the district court sits.").  "Because indemnity agreements and surety bonds are contracts under Maryland law, the Court applies Maryland's choice-of-law rules for contract claims."  *Travelers Casualty and Surety Co. of America v. C.R. Calderon Construction, Inc., et al.*, Civil Action No. TDC-17-0282, 2017 WL 2256600, at *2 (D. Md. May 22, 2017) (citing *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 844 A.2d 460, 468 (Md. 2004)).  Further, "[i]f a contract contains a choice-of-law provision, Maryland courts will apply the law of the state identified in that provision."  *Id.* (citing *Kunda v. C.R. Bard, Inc.*, 671 F.3d 464, 469 (4th Cir. 2011)).

Here, the parties are bound by the Indemnity Agreement, which contains a choice-of-law provision designating that New York law governs this dispute.  Pl.'s Mem. Supp. Mot. 11, ECF 2-1 (citing Indemnity Agreement at ¶ 12).  As Plaintiff correctly identifies, "this District has enforced a New York choice of law provision in an indemnity agreement between a surety and its indemnitors."  *Id.* (citing *Berkley Reg'l Ins. Co. v. Murray*, Civil Action No. DKC-15-0563, 2016 WL 235191, at *3 (D. Md. Jan. 20, 2016)).  Therefore, the Court will adhere to the choice-of-law provision of the Indemnity Agreement and apply New York law as it considers Plaintiff's First Count.

Plaintiff must show that it is likely to succeed on its First Count seeking "specific performance of the Indemnity Agreement to enforce XL's demand for collateral security against the Indemnitors."  Compl. ¶¶ 50–55.  "Indemnification agreements are valid and enforceable under New York Law."  *Star Ins. Co. v. Champion Constr. Servs. Corp.*, No. 13 CV 3635(ARR)(RML), 2014 WL 4065093, at *3 (E.D.N.Y. July 30, 2014) (citing *Am. Home Assurance Co. v. Gemma Constr. Co.*, 275 A.D.2d 616, 713 N.Y.S.2d 48, 52–53 (N.Y. App. Div. 2000)); *see also DiPizio Constr. Co., Inc. v. Erie Canal Harbor Dev. Corp.*, No. 2013–602666, 2015 WL 13284897, at *3

(N.Y. Sup. Ct. Apr. 24, 2015) ("[I]t is well settled that indemnity agreements . . . are enforceable in New York, and govern the relationship between the parties thereto[.]").  "Where the terms of the indemnity agreement are unambiguous, the Court must give effect to the express rights and obligations of the parties contained therein . . . ."  *DiPizio Constr. Co.*, No. 2013–602666, 2015 WL 13284897 at \*3.

Plaintiff asserts that the "plain language of the Indemnity Agreement" entitles it to injunctive relief as a matter of law.  Pl.'s Mem. Supp. Mot. 20, ECF 2-1.  Here, the terms of the Indemnity Agreement are unambiguous, therefore, this Court must give effect to the express rights and obligations of the parties contained in the Indemnity Agreement.  The parties do not dispute that Defendants agreed to be bound by the Indemnity Agreement and, upon demand by Plaintiff as Surety, agreed to deposit collateral with Plaintiff in connection with any claims arising from a performance bond.  Pl.'s Mem. Supp. Mot. 17, ECF 2-1 (citing Compl. ¶¶ 21, 23, ECF 1; Indemnity Agreement at ¶¶ 5, 8).  More specifically, by entering into the Indemnity Agreement with Plaintiff as "Surety," Defendants expressly agreed to the following:

> The Surety may, **at any time and for any reason in its sole discretion**, require the Indemnitors upon written notice to immediately procure the full release of the Bonds **or deliver to the Surety collateral security in the form acceptable to the Surety**.  The collateral security will be in an amount equal to 100% of all undischarged liability under all Bonds, which liability shall be determined by Surety as of the date of written notice.

Indemnity Agreement at ¶ 8 (emphasis added).

Defendants essentially concede that they are obligated to deliver some collateral pursuant to the Indemnity Agreement, but dispute what that amount should be.  Defs.' May 13, 2022 Ltr. 1, ECF 34 ("Defendants have acknowledged from the outset of this litigation that Plaintiff has fairly and accurately set forth the terms and conditions of the Surety [Indemnity] Agreement" but maintain that "some of Plaintiff's numbers are inflated and/or just not ripe for consideration.")

Defendants' main issue stems from Plaintiff's calculation of two of the seven unresolved claims: that of Depcom and MYR.  As to Depcom, Defendants essentially argue that Plaintiff's collateral demand is too high because Plaintiff may ultimately receive the demanded funds from another source.  *Id.*  As to MYR, Defendants claim that the request for $150,000.00 is a "plug-in number," which Defendants allege Plaintiff seeks prematurely and without justification.  *Id.*  Defendants suggest that "[i]f the Court allowed the process [of the parties cooperating to reduce Plaintiff's exposure] to continue to play out without formal and costly discovery[,] that amount likely would decrease."  *Id.* at 2.

Defendants' argument is unpersuasive.  Defendants do not address how the Indemnity Agreement affords Defendants the option to disregard Plaintiff's demand for collateral security.  Rather, the Court finds that Plaintiff adhered to the requirements in the Indemnity Agreement by sending Defendants two letters in late 2021, upon which Plaintiff gave Defendants written notice of its demand for collateral security.  *See* Compl., Ex. D at 1–6, ECF 1-4 (Pl.'s Nov. 11, 2021 Ltr.); Compl., Ex. E at 2–4, ECF 1-5 (Pl.'s Nov. 17, 2021 Ltr.).

Further, New York law holds that "[t]he obligation to make the deposit [of collateral security] is subject to enforcement by specific performance: 'The damage resulting from the failure to give security is not ascertainable, and the legal remedy is therefore inadequate[.]'"  *BIB Constr. Co., Inc. v. Fireman's Ins. Co. of Newark, New Jersey*, 214 A.D.2d 521, 523, 625 N.Y.S.2d 550, 552 (N.Y. App. Div. 1995) (quoting *Nat'l Sur. Corp. v. Titan Constr. Corp.*, 26 N.Y.S.2d 227, 230 (N.Y. Sup. Ct. 1940), *aff'd*, 260 App. Div. 911, 24 N.Y.S.2d 141 (N.Y. App. Div. 1940), *reargument denied*, 260 App. Div. 923, 25 N.Y.S.2d 398 (N.Y. App. Div. 1940)).  As such, the Court is inclined to enforce Defendants' obligation to deposit collateral security pursuant to Plaintiff's demand by specific performance because the damage from the failure to give Plaintiff

such security is not ascertainable, given that all claims against the Bonds have yet to be resolved and the likelihood that other claims against the Bonds will soon be submitted.

Similar to *BIB Constr. Co., Inc.*, the collateral security provision of the Indemnity Agreement specifically states that the amount of such requested security "will be in an amount equal to 100% of all undischarged liability under all Bonds, which liability shall be determined by Surety as of the date of written notice."  Indemnity Agreement at ¶ 8.  "So long as the sum demanded is reasonable, [the party] 'dealing at arm's length with relative equality of bargaining power' must abide by this term of the contract[.]"  *BIB Constr. Co., Inc.*, 625 N.Y.S.2d at 552. "Courts applying New York law have stated that as a general matter, '[a] demand for collateral is reasonable if the sum demanded is commensurate with the claims made against the surety or the amount sought by a third party in litigation.'"  *RLI Ins. Co. v. Pro-Metal Constr. Inc.*, No. 18-cv-2762(AJN), 2019 WL 1368851, at *4 (S.D.N.Y. Mar. 26, 2019) (quoting *Star Ins. Co.*, 2014 WL 4065093, at *3).

Plaintiff contends that "Defendants remain obligated to immediately deposit collateral security with XL in an amount no less than $500,647.95 because XL remains exposed to undischarged liability in that amount."  Pl.'s Memo 1, ECF 31.  More specifically, Plaintiff is "exposed to claims against the bonds ("Bonds") issued by XL on behalf of Bighorn Construction and Reclamation, LLC ("BCR") in the total amount of $450,647.95," which Plaintiff calculated by adding a total of seven "unresolved claims against the Bonds (for which no release has been provided to XL), excluding any funds retained by the project owner that may be available to resolve the claims[.]"[11]  *Id.*  Plaintiff also contends that it is owed an additional $50,000.00 as

_____

[11] The Court appreciates Plaintiff's itemized breakdown of the unresolved claims in light of the citations to other courts outside of the Fourth Circuit, which hold that a surety has no obligation to expressly detail its calculation of collateral sought.

"undischarged liability" because "under Paragraph 3 of the Indemnity Agreement, Indemnitors agreed that XL's liabilities include 'without limitation, attorney's fees, expert's fees, interest, court costs, investigative expenses, document reproduction and storage costs.'" *Id.* at 2 (Indemnity Agreement at ¶ 3). Plaintiff states that the $50,000.00 accounts for: "(i) the reasonable likelihood that MYR's claim exceeds $150,000; (ii) the reasonable probability that additional claims are brought against the Bonds; and (iii) the additional costs and attorneys' fees XL will incur to resolve the currently pending and future claims against the Bonds." *Id.*

The Court finds that Plaintiff's request for the additional $50,000.00 is reasonable, as Plaintiff's explanation of this figure fits the agreed upon definition of "undischarged liability" in the Indemnity Agreement. Therefore, the Court finds that there is enough in the record to support Plaintiff likely succeeding on its First Count at trial. Since the Court found that Plaintiff is likely to succeed on the merits on its First Count, the specific performance claim, the Court need not consider Plaintiff's other claims.

### 2.  *Likelihood of irreparable harm in the absence of preliminary relief*

Next, the Court considers whether Plaintiff makes a clear showing that irreparable harm is likely if the requested injunctive relief is not granted. "[T]he Supreme Court . . . require[es] plaintiffs to 'demonstrate that irreparable injury is *likely* in the absence of an injunction.'" *Roe*, 947 F.3d at 229 (emphasis in the original). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough." *Di Biase*, 872 F.3d at 230. Rather, Plaintiff must show that the harm is "neither remote nor speculative, but actual and imminent." *Bartlette v. Corizon, et al.*, Civil Action No. PX-21-2671, 2022 WL 888421, at * (D. Md. Mar. 25, 2022) (quoting *Direx Israel, Ltd. v. Breakthrough Medical Group*, 952 F.2d 802, 812 (4th Cir. 1991)).

Here, the Indemnity Agreement plainly states:

> Indemnitors acknowledge that failure to deposit such funds with Surety in accordance with this section shall cause irreparable harm for which Surety has no adequate remedy at law.  Indemnitors agree that Surety shall be entitled to injunctive relief for specific performance of Indemnitors' obligation to deposit funds in accordance with this section and expressly waive and relinquish any claims or defenses to the contrary.

Indemnity Agreement at ¶ 5.  The language of the contract could not be clearer in establishing that Defendants' failure to deposit collateral security categorically constitutes irreparable harm.  Furthermore, the contract explicitly provides for the remedy of such irreparable harm: injunctive relief for specific performance, which is precisely what Plaintiff is requesting here.

"Sureties are ordinarily entitled to specific performance of collateral security clauses," because absent specific performance, the surety will lose "the security position for which [it] bargained." *Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433 (9th Cir. 1984).  As such, courts in this District[12] have regularly found irreparable harm when a plaintiff shows a breach of a collateral security provision in a valid indemnity agreement.  *See, e.g., C.R. Calderon Constr.,*

---

[12] No party has raised the question of whether the Court should apply New York state law or Fourth Circuit law in applying *Winter*'s "irreparable harm" prong.  *See Atl. Diving Supply, Inc. v. Moses*, No. 2:14-CV-380, 2014 WL 3783343, at *11 (E.D. Va. July 31, 2014).  Defendants cite to Fourth Circuit law.  *See* Defs.' Reply to Mot. 4–5, ECF 11.  Plaintiff relies on federal law from multiple circuits as well as New York state law.  *See* Pl.'s Mem. Supp. Mot. 13–15, ECF 2-1.  However, the Court need not address this question since the outcome remains the same under New York state law or Fourth Circuit law.  *See C.R. Calderon Constr., Inc.*, 2017 WL 2256600, at *4 (collecting cases from this circuit); *Colonial Sur. Co. v. Eastland Const., Inc.*, 77 A.D.3d 581, 582, 913 N.Y.S.2d 8, 9 (2010) (granting a similar preliminary injunction under New York State law pursuant to a contractual provision); *Hartford Fire Ins. Co. v. Saunders Concrete Co.*, No. 5:11-CV-677, 2012 WL 3822097, at *3 (N.D.N.Y. Sept. 4, 2012) ("The Court finds that Plaintiff is entitled to a collateral security deposit pursuant to the Agreement and, thus, grants Plaintiff's motion to the extent it seeks a mandatory preliminary injunction to that effect."); *U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F. Supp. 2d 915, 923 (E.D.N.Y. 1999) (collecting additional cases); *but see Westchester Fire Ins. Co. v. DeNovo Constr., Inc.*, 177 F. Supp. 3d 810, 813 (S.D.N.Y. 2016) (applying Second Circuit law and finding that "a collateral deposit provision, standing alone, is insufficient to demonstrate irreparable injury.")

*Inc.*, 2017 WL 2256600, at *4 (collecting cases); *BRC Uluslararasi Taahut*, 2020 WL 6801933, at *14; *Truland*, 2014 WL 4230388, at *4.  As Judge Xinis noted, "the nature of the injury is not simply monetary."  *BRC Uluslararasi Taahut*, 2020 WL 6801933, at *14.  Rather, "[t]he harm amounts instead to the failure . . . to perfect [a] security interest."  *Id.*  "This security interest would otherwise be lost absent specific performance, which is achieved by granting the requested injunctive relief."  *Id.* (citing *C.R. Calderon Constr.*, 2017 WL 2256600, at *4).  "In this critical respect, 'a surety's loss of its right to collateralization cannot be adequately remedied through money damages."  *Id.* (quotation omitted) (collecting cases).

Plaintiff notes that "irreparable harm" based on a contractual position is well-established in this District and beyond.  Pl.'s Mem. Supp. Mot. 13–15, ECF 2-1.  Defendants admit that they are obligated to post collateral and concede that they have not done so.  Defs.' May 13, 2022 Ltr. 1, ECF 34.  Moreover, as of at least May 13, 2022, Defendants have apparently refused to allow Plaintiff to inspect books and records "in order to prevent the possible transfer of certain assets which will be used to satisfy the Indemnitors obligations under the Indemnity Agreement."  Pl. Mem. Supp. Mot. 30, ECF 2-1; *see also* Defs.' May 13, 2022 Ltr. 1, ECF 34 (acknowledging that inspection has not occurred but arguing that the "*need* for inspection" has decreased because the requested relief has been reduced) (emphasis added).  Defendants also contend that Plaintiff's agreement to "work[] with the Defendants for 30 days to significantly reduce outstanding claims" means any alleged harm is not immediate.  Defs.' Reply to Mot. 4–5, ECF 11.  However, this is precisely the type of argument Plaintiff sought to avoid when it conditioned its agreement to extend Defendants' response deadline in December 2021 by stating "it is doing so without waiving its argument that it currently faces immediate and irreparable harm[.]"  Joint Mot. ¶ 6, ECF 8.  The Court declines to punish Plaintiff for reasonably agreeing to give Defendants more time to respond

to its Motion and will not disregard the condition on which Plaintiff agreed to extend Defendants' response deadline.  The Court finds that the second *Winter* factor is satisfied in Plaintiff's favor.

### 3. The balancing of equities

Next, the Court considers whether the balance of equities tilts towards granting the preliminary injunction.  "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, . . . but to balance the equities as the litigation moves forward." *Int'l Refugee Assistance Project*, 137 S.Ct. at 2087 (internal citation omitted).  "The district court must weigh the harm to the moving party if the injunction is not granted against the harm to the non-moving party if the injunction is granted." *Metalcraft of Mayville Inc. v. The Toro Co.*, 848 F.3d 1358, 1369 (Fed. Cir. 2017).

In this case, Plaintiff will likely be harmed in at least two ways in the absence of injunctive relief.  First, the more liability that Plaintiff carries without adequate assurance that such liability will be repaid, the less likely Plaintiff will be able to effectuate its business.  Second, the failure to issue an injunction would send a message to Plaintiff's other customers that compliance with clear and unambiguous contractual provisions is somehow optional.  On the other hand, the likely harm that Defendants will suffer if the injunctive relief is granted is less compelling.  The circumstances requiring Defendants to deposit collateral security are clearly delineated in the Indemnity Agreement and appear to be satisfied here.  Simply "requiring a party to comply with its contractual obligations does not constitute harm." *Toolchex, Inc. v. Trainor*, 634 F.Supp.2d 586, 593 (E.D. Va. 2008) (citation omitted).  In comparing the relative weight of the likely harms suffered, the balance of equities also tilts in Plaintiff's favor.

### 4. The public interest

Lastly, the Court considers whether granting an injunction in this case would be in the public's interest.  *See Int'l Refugee Assistance Project*, 137 S.Ct. at 2087 (quoting *Winter*, 555 U.S. at 26) ("In awarding a preliminary injunction a court must also 'conside[r] . . . the overall public interest.'").  Here, the public interest weighs in favor of a preliminary injunction because the public would be assured that contractual obligations are enforced.

"The public interest 'favors requiring parties to abide by legitimate terms of their contracts, if not unreasonable.'"  *Coastal Laboratories, Inc. v. Jolly*, Civil Action Nos. RDB-20-2227, RDB-21-0137, 2021 WL 1599224, at *10 (D. Md. Apr. 23, 2021) (quoting *ICENY USA, LLC v. M&M's, LLC*, 421 F. Supp. 3d 204, 223 (D. Md. 2019)); *NaturalLawn of America, Inc. v. West Group, LLC*, 484 F. Supp. 2d 392, 404 (D. Md. 2007) ("It is in the public interest to . . . enforce valid contracts.").  The Indemnity Agreement, by which both parties agreed to be bound, prescribes a framework for resolving disputes identical to the current dispute in this case.  It is in the public interest to enforce the prescribed a remedy to maintain the public's faith that their own valid contracts are binding and judicially actionable.  The final *Winter* factor also tips in Plaintiff's favor.

### C. Bond

Rule 65 permits a court to issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  Importantly, a "district court retains the discretion to set the bond amount as it sees fit or waive the security requirement" altogether.  *Pashby*, 709 F.3d at 332.

Here, Defendants concede that collateral is owed to Plaintiff, with the only issue being the amount owed.  The parties have incurred their respective costs associated with this matter and Plaintiff presumably has sufficient resources to provide damages to Defendants if they ultimately

prevail in this litigation.  Furthermore, Defendant has not requested that this Court impose a bond upon Plaintiff.  Therefore, the Court deems it proper to waive the security requirement in this case.

### D.  Request to Inspect Books and Records

Plaintiff also seeks a preliminary injunction requiring Defendants "to provide [Plaintiff] with full and complete access to all of Indemnitors' books, records, and other documents, including financial book, records, documents and accounts maintained by them or any of them in which they may have an interest for inspection and copying."  Pl.'s Mot. 2, ECF 2.  For the reasons noted above, the Court is generally inclined to grant the request.  However, Plaintiff has noted that the discovery process might meet the same goal, therefore impacting the second prong of the *Winter* analysis.  *See* Pl.'s May 6, 2022 Ltr. 1, ECF 31 ("[D]iscovery will only obviate XL's need to inspect Defendants' books and records if Defendants agree to timely produce such documentation without objection during the disclosure process.").  As such, the Court will deny the request to inspect books and records without prejudice to allow Plaintiff to raise the issue in the future.

### IV.  <u>CONCLUSION</u>

For these reasons, the Court finds that Plaintiff has met its burden under the four *Winter* factors such that granting Plaintiff's Motion for a preliminary injunction, in part, is appropriate.

"Rule 65 requires that '[e]very order granting an injunction . . . state in terms specifically; and describe in reasonable detail . . . the acts or acts retrained.'"  *Shibumi Shade, Inc. v. Beach Shade LLC*, (2022) (quoting Fed. R. Civ. P. 65(d)(1)).  "An injunctive 'order must be tailored as precisely as possible to the exact needs of the case.'"  *Id.* (quoting *CPC Int'l, Inc. v. Skippy Inc.*, 214 F.3d 456, 461 (4th Cir. 2000)).  Further, "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed."  *Pashby*, 709 F.3d at 331.

Accordingly, it is hereby **ORDERED** that:

(1) Plaintiff's Emergent Motion for Temporary and Preliminary Injunctions, ECF 2, is **GRANTED IN PART**, as delineated below, and **DENIED IN PART**, as Plaintiff's request to inspect Defendants' books and records is denied without prejudice;

(2) Within 14 days of the entry of this Order, Defendants are directed to deposit collateral security with Plaintiff in the total amount of $500,647.95 (the "Collateral"), in accordance with the Indemnity Agreement, noting that this obligation is joint and several and a total payment in that amount shall sufficiently cover Plaintiff's exposure on behalf of all eleven Defendants;

(3) If Defendants do not deposit the Collateral within 14 days of the entry of this Order, this Order shall operate as a lien, mortgage or other encumbrance on the assets of each Defendant in the amount of the Collateral, authorizing Plaintiff to file this Order with the appropriate authority as determined by the location of each Defendant's property;

(4) Defendants are enjoined and restrained, until further order of the Court, from transferring, conveying, selling, encumbering in any manner, any property or assets, which are jointly or solely owned by Defendants, unless and until the Collateral is deposited; and

(5) Defendants are enjoined and restrained, until further order of the Court, from destroying, deleting, tampering, altering or otherwise changing Defendants' records. However, the request to inspect books and records is denied without prejudice to Plaintiff to raise the issue in the future.

A separate implementing Order follows.

Dated: <u>June 10, 2022</u>                                    <u>                /s/                </u>
                                                                                Brendan A. Hurson
                                                                                United States Magistrate Judge